TWC v. Lakeshore 



IN THE COURT OF APPEALS, THIRD DISTRICT OF TEXAS,



AT AUSTIN




 





NO. 3-93-432-CV





TEXAS WATER COMMISSION,



 APPELLANT


vs.





LAKESHORE UTILITY COMPANY, INC.,



 APPELLEE



 




FROM THE DISTRICT COURT OF TRAVIS COUNTY, 98TH JUDICIAL DISTRICT



NO. 480,160, HONORABLE PAUL R. DAVIS, JR., JUDGE PRESIDING



 





 This is an appeal from a suit for judicial review of an order of the Texas Water
Commission (the "Commission"). (1) Lakeshore Utility Company ("Lakeshore") filed an application
with the Commission seeking a rate increase for its water and sewer services. The Commission
in large part denied Lakeshore's application. The district court reversed the Commission's order
and remanded the cause to the Commission with instructions. We will reverse the judgment of
the district court and affirm the order of the Commission. 



BACKGROUND


 Lakeshore is a small, privately-owned utility that provides water and sewer services
to residential customers in Henderson County. Lakeshore's stock is wholly owned by Sentry Title
Company ("Sentry"), as are the physical plant and facilities Lakeshore uses in providing its utility
services.

 On January 23, 1989, Lakeshore filed an application for a rate and tap fee increase
with the Commission. Lakeshore's application also sought a temporary surcharge of $4.58 per
month per customer for five years to cover system improvements. The rate increase and
surcharge sought by Lakeshore were to apply to approximately 111 residential customers in two
subdivisions, Esquire Estates II and Point LaVista. Since Lakeshore's organization in 1978, the
utility had received one rate increase, in 1987, which applied only to the Point LaVista
subdivision. The Esquire Estates II subdivision was still subject to rates set in 1978. On March
1, 1989, Lakeshore put into effect on an interim basis the rates requested in its application.

 After the subdivision homeowners' associations and the Office of Public Utility
Counsel objected to the proposed rate increase, an evidentiary hearing was held before the
Commission on August 1-2, 1989. After the hearing, the hearing examiner recommended, and
the Commission approved, an order denying the majority of Lakeshore's requests. (2)

 Lakeshore brought a suit for judicial review of the Commission's order pursuant
to the Administrative Procedure Act. See Tex. Gov't Code Ann. § 2001.171 (West Supp. 1994). (3) 
Following a hearing on June 7, 1991, the district court rendered final judgment, reversing the
Commission's order and remanding the cause to the Commission. In its judgment, the district
court stated that it found "numerous errors in the treatment of this case by the Texas Water
Commission." 

 The Commission appeals the district court's judgment, bringing seven points of
error. We will reverse the judgment of the district court and affirm the Commission's order.



DISCUSSION


Ratemaking Authority of the Texas Water Commission

 The Water Code invests the Commission with the authority to fix and regulate the
rates charged by water and sewer utilities. Tex. Water Code Ann. § 13.181 (West Supp. 1994). 
This appeal, in large part, represents a conflict between two Water Code provisions that govern
the Commission's ratemaking authority. On the one hand, the Commission must fix a utility's
"overall revenues at a level that will: (1) permit the utility a reasonable opportunity to earn a
reasonable rate of return on its invested capital used and useful in rendering service to the public
over and above its reasonable and necessary operating expenses; and (2) preserve the financial
integrity of the utility." Tex. Water Code Ann. § 13.183(a) (West Supp. 1994). On the other
hand, "[i]n any proceeding involving any proposed change of rates, the burden of proof shall be
on the utility to show that the proposed change, if proposed by the utility . . . is just and
reasonable." Tex. Water Code Ann. § 13.184(c) (West 1988).

 The overall positions taken by the parties mirror these code provisions. Lakeshore
argues that the Commission has acted arbitrarily and capriciously--even punitively--by approving
a rate increase of only $1,265.40 per year. (4) Since Lakeshore has operated at an average loss of
approximately $27,800 per year, Lakeshore contends that the Commission's decision threatens
the utility's financial survival. The Commission responds that Lakeshore simply failed to shoulder
its burden of proof. The Commission argues that the evidence in the record is wholly inadequate
to justify the increase in rates and tap fees, as well as the surcharge, requested by Lakeshore.



Standard of Review 

 We must view the arguments of Lakeshore and the Commission through the prism
of substantial evidence review. Tex. Water Code Ann. § 13.381 (West 1988); Texas Water
Comm'n v. Customers of Combined Water Sys., 843 S.W.2d 678, 680-81 (Tex. App.--Austin
1992, no writ). The test under substantial evidence review is whether the evidence as a whole is
such that reasonable minds could have reached the conclusion that the agency must have reached
in order to justify its action. APA § 2001.174(2)(E); Texas State Bd. of Dental Examiners v.
Sizemore, 759 S.W.2d 114, 116 (Tex. 1988). We must review the record to determine whether
there was a reasonable basis for the Commission's action. Customers of Combined Water Sys.,
843 S.W.2d at 681; United Resource Recovery, Inc. v. Texas Water Comm'n, 815 S.W.2d 797,
801 (Tex. App.--Austin 1991, writ denied). In doing so, we may not substitute our own judgment
as to the weight of the evidence. APA § 2001.174; Customers of Combined Water Sys., 843
S.W.2d at 680-81. We must reverse the Commission's order if it is not supported by substantial
evidence or if the order was arbitrary, capricious, or an abuse of discretion. APA §
2001.174(2)(F); Customers of Combined Water Sys., 843 S.W.2d at 680. We must uphold the
Commission's order if (1) the findings of underlying fact in the order fairly support the
Commission's findings of ultimate fact and conclusions of law, and (2) the evidence presented at
the hearing reasonably supports the findings of underlying fact. Customers of Combined Water
Sys., 843 S.W.2d at 680.



Interest Expense on Loan from Sentry

 In its first point of error, the Commission contends that the district court erred in
finding that the Commission should have allowed $11,410 in claimed interest expense. The
$11,410 interest charge was incurred on a loan from Sentry, Lakeshore's parent company, paid
incrementally to Lakeshore over an eight-year period. In its application, Lakeshore requested that
the interest expense be treated as an operating expense. Lakeshore presented uncontroverted
evidence that the payments were made by Sentry to help Lakeshore meet shortfalls in its operating
revenues. However, while the payments from Sentry were recorded as deposits to Lakeshore's
account, Lakeshore's records did not specify how the loan proceeds were used. Further, there
was testimony at the hearing that Lakeshore had operated several utility systems over the eight-year period, and Lakeshore was unable to produce evidence that the loan proceeds had been used
only on Esquire Estates II and Point LaVista, the subdivisions from which Lakeshore was seeking
the rate increase. 

 The Commission disallowed the interest payments for three reasons. First, because
Lakeshore offered no evidence detailing how the loan proceeds were expended other than that the
proceeds were used for the daily operating expenses of the utility, the Commission found that "the
accompanying request for interest expense was not established as reasonable and necessary." 
Second, the Commission found that the interest payments from Lakeshore to Sentry were
inappropriate "in light of the artificial separation of ownership and operation of the utility." 
Third, the Commission found that the "cash flow problems experienced by the utility should have
been resolved by properly prepared and presented rate increase requests."

 Lakeshore argues that it met its burden of presenting evidence that the interest
expense was reasonable and necessary. During the hearing, Lakeshore's general manager, Alan
Whatley, testified that the loan proceeds were used to cover the shortfall between Lakeshore's
revenue and expenses; that the funds were used solely for operating expenses; and, that the
interest rate charged by Sentry was below the market rate. Lakeshore contends that this evidence
established that it was entitled to have the interest expense included in its rate base. Tex. Water
Code Ann. § 13.185(e) (West 1988). The district court agreed with Lakeshore, finding that the
Commission erred in disallowing the interest expense.

 Lakeshore is correct that interest payments made by a utility to its parent company
may be treated as operating expenses for ratemaking purposes. However, section 13.185(e) of
the Water Code permits the Commission to treat interest payments to affiliated interests (5) as
operating expenses only under certain circumstances:



Payment to affiliated interests for costs of any services, or any property, right or
thing, or for interest expense may not be allowed either as capital cost or as
expense except to the extent that the regulatory authority finds that payment to be
reasonable and necessary. A finding of reasonableness and necessity must include
specific statements setting forth the cost to the affiliate of each item or class of
items in question and a finding that the price to the utility is no higher than prices
charged by the supplying affiliate to its other affiliates or divisions for the same
item or items, or to unaffiliated persons or corporations.



Tex. Water Code Ann. § 13.185(e) (West 1988) (emphasis added). (6) Thus, section 13.185(e) only
permits inclusion of interest payments to an affiliated interest if the Commission finds the
payments were "reasonable and necessary." The Commission is given considerable discretion in
making this determination. We conclude that the record supports the Commission's disallowance
of the interest payments for the following reasons.

 First, as we have stated, the burden was on Lakeshore to prove that the interest
expense was reasonable and necessary. Tex. Water Code Ann. § 13.184(c) (West 1988). 
Lakeshore failed to carry this burden; Lakeshore did not demonstrate how the loan proceeds
contributed to the systems that provided services to the Point LaVista and Esquire Estate II water
subdivisions, from which Lakeshore sought a rate increase. Lakeshore merely presented
testimony that the loan proceeds were used to cover shortfalls in the utility's operating revenues. 
Without knowing how the loan proceeds were spent, the Commission could not properly
determine that the loan payments were reasonable and necessary for Lakeshore's provision of
service to these customers. Additionally, evidence presented in the hearing indicates that
Lakeshore had operated several systems during the period when the loan proceeds were received. 
Lakeshore's manager was unable to guarantee that the loan payments were spent only on the two
systems from whose ratepayers Lakeshore was seeking a rate increase. We conclude that this
evidence adequately supports the Commission's disallowance of the interest expense.

 Lakeshore contends, however, that in determining whether to allow the interest
expense, the Commission was permitted only to consider the factors referred to in section
13.185(e), namely, "the cost to the affiliate of each item or class of items in question" and that
"the price to the utility is no higher than prices charged by the supplying affiliate to its other
affiliates or divisions for the same item or items, or to unaffiliated persons or corporations." Tex.
Water Code Ann. § 13.185(e) (West 1988). We disagree with Lakeshore's interpretation of this
section. While section 13.185(e) requires that a Commission finding of reasonableness and
necessity be supported by the above inquiries, the provision does not prohibit consideration of
other factors. Section 13.185(e) only requires the above inquiries if the Commission makes a
finding of reasonableness and necessity. Accordingly, we do not think the Commission acted
arbitrarily and capriciously by basing its disallowance of the expense on Lakeshore's failure to
present a breakdown of the use of the loan proceeds. Indeed, a breakdown was necessary for the
Commission to determine that the loan was used to meet reasonable and necessary expenses.

 The Commission also based its disallowance of the interest expense on the fact that
Lakeshore could have sought rate increases to meet its shortfalls over the eight-year period rather
than obtaining loans from its parent company. We view this factor as properly part of the
Commission's analysis. Several policy considerations support encouraging utilities to seek
periodic rate increases to cover operating shortfalls rather than obtaining loans. First and
foremost is the issue of administrative oversight. The provisions of the Water Code "establish
a comprehensive regulatory system that is adequate to the task of regulating retail public utilities
to assure rates, operations, and services that are just and reasonable to the consumers and to the
retail public utilities." Tex. Water Code Ann. § 13.001(c) (West Supp. 1994). The Commission
is charged with the duty of "protect[ing] the public interest inherent in the rates and services of
water and sewer utilities." Tex. Water Code Ann. § 13.001(a) (West Supp. 1994). If a utility
obtains a loan to cover revenue shortfalls over an extended period of time, and then seeks
inclusion of the interest expense as an operating expense, the Commission tends to lose its ability
to oversee the utility's operations. (7) Furthermore, regular rate increases to meet shortfalls, rather
than loans, more fairly allocate the cost of water and sewer services to ratepayers over time. The
Commission's staff presented evidence that the effect of taking out loans to account for shortfalls
in operating revenues over a period of years and then including the interest expense in the utility's
operating expenses, as opposed to seeking periodic rate increases to meet the shortfalls, has the
effect of forcing current ratepayers to subsidize the lower rates paid by customers in past years. (8)
 
Accordingly, for these policy reasons and the lack of evidence in the record regarding how the
loan proceeds were used, we conclude that the Commission did not err in disallowing the interest
expense. The Commission's first point of error is sustained.



Rate of Return Based on Invested Capital or Leasing Costs

 In its second point of error, the Commission contends that the district court erred
in finding that the Commission should have granted Lakeshore a reasonable rate of return on
invested capital for the plant and equipment owned by Sentry, the parent company, or in the
alternative, an allowance for the cost of leasing the facilities from Sentry. During the hearing,
Lakeshore requested inclusion of the costs of the Sentry-owned facilities in its rate base as an
alternative to inclusion of the interest expense. The Commission, however, interpreted
Lakeshore's rate-increase application as requesting a zero rate of return, and further determined
that Lakeshore could not receive a rate of return on the water and sewer facilities because
Lakeshore did not own them. The Commission instead determined that Lakeshore's rate base was
$7,204, based upon staff recommendations that certain items be capitalized. The district court
concluded that the Commission erred, finding that it should have granted Lakeshore a rate of
return on the facilities owned by Sentry, so long as they were "used by and useful to Lakeshore
in providing service to its customers," or alternatively, should have granted a rate of return on
"a reasonable amount for the leasing of such facilities together with the cost of improvements
made to the system [by Lakeshore]."

 As an initial matter, we do not agree with the Commission's contention that
Lakeshore requested a zero rate of return in its application. A liberal reading of the application
indicates that the utility requested a rate of return based on the value of the Sentry-owned
facilities. Question 17 on the rate application asked, "Why would this rate of return be considered
reasonable in today's market?" Lakeshore responded, "Reasonable Rate would be 13-15% on
Cap. ($385,000.00) (9) water & sewer systems. None received since 1978." We conclude that this
response was adequate to apprise the Commission that Lakeshore was requesting that the Sentry-owned facilities be treated as its invested capital.

 Additionally, contrary to the Commission's view, there conceivably could be
situations in which a utility's facilities are wholly owned by a separate entity, (10) and yet the utility
meets its burden of demonstrating that it is entitled to a rate of return on the facilities. Section
13.183(a)(1) of the Water Code requires only that a utility's invested capital be "used and useful
in rendering service to the public" for the utility to earn a reasonable rate of return on the invested
capital. Tex. Water Code Ann. § 13.183 (West Supp. 1994). However, we need not address in
this case whether ownership of facilities is necessary for treatment as invested capital because we
conclude that Lakeshore failed to meet its burden of proof in establishing the value of the facilities
as invested capital pursuant to the Water Code.

 Section 13.185(a) of the Water Code defines invested capital as "the actual money
cost or the actual money value of any consideration paid, other than money, of the property at the
time it shall have been dedicated to public use, whether by the utility that is the present owner or
by a predecessor, less depreciation." Tex. Water Code Ann. § 13.185(b) (West 1988).

Lakeshore refers in its brief to an "unrebutted showing of a $410,000 rate base capital," referring
to the values listed on its rate-increase application. However, this portion of Lakeshore's
application is not a part of the evidence which would support a Commission finding. The hearing
examiner only admitted Lakeshore's application into evidence for the limited purpose of showing
what rate increase Lakeshore was seeking and the expenses Lakeshore claimed to support its
request. 

 Furthermore, even if this information were part of the evidence before the
Commission, it would not support treating the facilities as invested capital. The rate-increase
application was a form generated by the Commission. For both the water and sewer facilities, the
form requested a description of various items, such as land, structures and equipment, as well as
additional components of the water and sewer systems. To the right of each item, space was
provided for the date of installation, the original cost when installed, and the annual depreciation
expense for each item. Lakeshore listed each item for its water and sewer systems, but left blank
each item's date of installation, original cost when installed, and annual depreciation. Lakeshore
then listed a total original cost when installed for the entire water facility and the entire sewer
facility. In addition, Lakeshore listed without elaboration $12,500 in improvements made to both
the water and sewer facilities.

 Lakeshore's application lacks the information required by section 13.185(a) of the
Water Code; the application does not contain (1) a breakdown by item of the cost of the facilities
when installed; (2) the date of installation of each item; or (3) a depreciation value for each item. (11) 
Because Lakeshore did not introduce into the record the evidence necessary for the Commission
to evaluate the facilities as invested capital, Lakeshore cannot complain that the Commission did
not grant it a reasonable rate of return on the Sentry-owned facilities as invested capital.

 Lakeshore has made several persuasive arguments, both in its brief and in oral
argument, attacking the Commission's disallowance of Lakeshore's interest expense and the
Commission's refusal to treat the Sentry-owned facilities as Lakeshore's invested capital. 
Lakeshore first argues that the Commission has taken internally inconsistent positions. On the
one hand, the Commission held that Lakeshore should be allowed neither a return on the Sentry-owned facilities nor a reasonable expense for the costs of leasing the facilities because the facilities
are owned by Sentry. On the other hand, the Commission also disallowed the interest expense
Lakeshore incurred on its loans from Sentry because Sentry is an "affiliated interest." Lakeshore
contends that the Commission should either treat Lakeshore and Sentry as one entity, and grant
Lakeshore a rate of return on the facilities owned by Sentry, or treat Lakeshore and Sentry as
separate entities, and allow Lakeshore's interest expense. Lakeshore also points to the
Commission's valuation of Lakeshore's invested capital at $7,204, arguing that this value is
clearly inadequate, since no utility could provide water and sewer services to 111 customers with
only such meager facilities at its disposal.

 These arguments clearly influenced the district court, which ordered the
Commission to grant Lakeshore a reasonable rate of return or, alternatively, include as an
allowable cost the cost of leasing the facilities from Sentry. However, when these otherwise
compelling arguments are measured against the cold reality of the administrative record, they fail. 
As we have stated, Lakeshore failed to prove pursuant to the requirements of the Water Code the
value of the facilities to qualify as invested capital. With regard to the district court's finding that
the Commission should have granted Lakeshore an allowance for the cost of leasing the facilities
from Sentry as an alternative, we note that we have found nothing in Lakeshore's application or
in the administrative record to indicate that a lease existed or that payments were made to Sentry
for the use of the facilities, nor is there any testimony regarding the reasonable value of a
hypothetical lease between Lakeshore and Sentry.

 Because the application was not in evidence, and even if it had been in evidence,
would not have supported the facilities' treatment as invested capital upon which Lakeshore could
receive a rate of return, we cannot conclude that the Commission erred in refusing Lakeshore's
request for a rate of return on the Sentry-owned facilities. Accordingly, we sustain the
Commission's second point of error.



Surcharge for Cost of Improvements

 In its third point of error, the Commission contends that the district court erred in
finding that the Commission should have allowed Lakeshore to recover from its customers a
surcharge for the cost of improvements.

 Lakeshore requested that the Commission allow it to impose a surcharge on its
customers to cover the cost of several system improvements. The requested surcharge was to be
billed to its customers at a rate of $4.58 per month for five years. At the time of the hearing,
Lakeshore had already spent approximately $17,700 of the requested surcharge, which it had
obtained from a private lender, on improvements to the Point LaVista system. Lakeshore asserted
that the fact that it had already spent a portion of the requested surcharge demonstrated that it was
entitled to receive the surcharge. Lakeshore intended to spend the remaining $7,300 on drilling
a water well on property owned by Participation Development Corporation, from which
Lakeshore purchased water and sewage treatment services for its Esquire Estate II customers. To
support its requested surcharge, Lakeshore cited instances where the Public Utility Commission
of Texas, the Commission's predecessor agency, (12) had approved surcharges for water utilities.

 The Commission disallowed the $25,000 surcharge. The Commission took the
position that the normal method for recovering capital investments was to include them in the
utility's rate base through capitalization, whereby the utility could receive a return on its
investment. The Commission conceded that in exceptional cases, the utility could collect revenue
through a surcharge; for example, when the utility was unable to obtain financing elsewhere. 
However, since Lakeshore had already obtained financing from a private lender for the bulk of
the amount it was seeking, the Commission did not consider this an exceptional circumstance
where a surcharge was appropriate. Furthermore, the Commission relied upon hearing testimony
that surcharges shift the risk of operating a utility from the utility to its customers, and that
borrowing capital for improvements is just a part of the business of running a utility. Finally, the
Commission regarded a surcharge for the remaining $7,300 as inappropriate because Lakeshore
did not provide evidence of the expected cost of drilling the well, and because the well was to be
drilled on the property of another utility, and therefore would serve to benefit the other utility's
customers. The district court found that the Commission's disallowance of the surcharge was
error.

 The Water Code provides that the Commission may permit a utility to collect a
surcharge from its customers. 



 In a rate proceeding, the regulatory authority may authorize collection of
additional revenues from the customers to provide funds for capital improvements
necessary to provide facilities capable of providing adequate and continuous utility
service if an accurate accounting of the collection and use of those funds is
provided to the regulatory authority. A facility constructed with surcharge funds
is considered customer contributed capital or contributions in aid of construction
and may not be included in invested capital, and depreciation expense is not
allowed.



Tex. Water Code Ann. § 13.183(b) (West Supp. 1994) (emphasis added). Section 13.183(b)
permits the Commission to allow a utility to collect a surcharge, provided the utility furnishes the
Commission with information regarding the intended use of the funds collected. Additionally, the
Water Code grants the Commission discretion to determine whether a surcharge is appropriate. 
Given that (1) Lakeshore had already succeeded in obtaining a loan to defray a significant portion
of the requested surcharge, (2) Lakeshore did not present evidence regarding the expected cost
of drilling the well, and (3) the well was to be drilled on the property of another utility system
whose customers would benefit at the expense of Lakeshore's customers, we conclude that the
Commission did not err in denying the requested surcharge. The Commission's third point of
error is sustained.



Increase in Sewer Tap Fees

 In its fifth point of error, the Commission contends that the district court erred in
finding that the Commission should have granted Lakeshore an increase in sewer tap fees. A $550
tap fee, charged when service was installed for new customers, was permitted under Lakeshore's
tariff in effect at the time of the hearing. However, Lakeshore had begun charging new customers
a $1,150 tap fee prior to the hearing.

 Lakeshore argued that the added fee covered the cost of installing sewer pumps at
the customers' residences, which was necessary given the nature of the sewer service provided
to its customers. Lakeshore operates a pressure effluent sewer system, as opposed to a gravity
flow system, the latter being the type of system most commonly used in sewer systems throughout
the country. Lakeshore's customers reside on lake-front property, just above lake-level. 
Consequently, sewage must be pumped uphill to Lakeshore's sewer mains at the roadway level. 
Lakeshore contended that because a pressure effluent system was a "non-standard sewer system,"
they were justified in passing the extraordinary expense, i.e., the cost of the pumps, on to their
customers. The record indicates that all of Lakeshore's sewer service customers in the Point
LaVista and Esquire Estates II subdivisions require a pressure effluent pump.

 The Commission denied Lakeshore an increase in sewer tap fees. The Commission
found that Lakeshore could not charge its customers for the sewer pumps because they were
"standard within the Lakeshore system." The district court reversed, finding that the Commission
erred by denying the tap fee increase because it failed to "recogniz[e] the unique costs associated
with providing sewer service using a pressure effluent system necessary because most of
Lakeshore's customers are located below the level of its sewer mains."

 The Commission contends that its rule 291.85(e)(2) governs the setting of
Lakeshore's tap fees. 31 Tex. Admin. Code § 291.85(e)(2) (1993). Rule 291.85(e)(2) reads in
part, "The individual residential customer shall not be charged for any additional production,
storage, or treatment facilities unless the customer places unique, nonstandard service demands
upon the systems, in which case the customer may be charged the full cost of extending service
to and throughout their property . . . ." (emphasis added). The Commission argues that since all
of Lakeshore's customers require the sewer pump, it cannot be a "unique, nonstandard" service
demand upon Lakeshore's system.

 Lakeshore contends that the Commission's own rules provide two alternate
justifications for increasing its tap fees to cover the cost of installing the pumps. First, Lakeshore
cites 31 Tex. Admin. Code § 291.85(b)(1)(C) (1993), which allows a utility to charge an
additional fee "for tap expense not normally incurred, such as a grinder pump or a road bore for
customers outside of subdivisions or residential areas." Lakeshore contends that rules
291.85(b)(1)(C) and 291.85(e) together allow the utility "to pass extraordinary expenses associated
with provisions of service on to the customers requiring such extraordinary service." Second,
Lakeshore relies upon another Commission rule, which states, "In determining standard practice,
the commission will be guided by the provisions of American Water Works Association, and such
other codes and standards that are generally modified by this commission . . . ." 31 Tex. Admin.
Code § 291.95 (1993) (emphasis added). Lakeshore argues that because there is no evidence or
finding in the Commission order that its pumps fall under such "standard practice," the
Commission's disapproval of the increase in tap fees is unsupported by substantial evidence.

 An agency's interpretation of its own rules is entitled to deference from the courts. 
Public Util. Comm'n v. Gulf States Util., 809 S.W.2d 201, 207 (Tex. 1991); Reed v. Dep't of
Licensing and Regulation, 820 S.W.2d 1, 3 (Tex. App.--Austin 1991, no writ). As a result, "[o]ur
review is limited to determining whether the administrative interpretation `is plainly erroneous
or inconsistent with the regulation.'" Gulf States Util., 809 S.W.2d at 207 (quoting United States
v. Larionoff, 431 U.S. 864, 872 (1977)). We regard the Commission's interpretation as neither
plainly erroneous nor inconsistent with the wording of rule 291.85(e)(2). Accordingly, given the
evidence in the record that all of Lakeshore's customers require a pressure effluent pump, we
conclude that the Commission did not err in denying Lakeshore's request for an increase in tap
fees. The Commission's fifth point of error is sustained. 



Other Points of Error

 In its fourth point of error, the Commission contends that the district court erred
in finding that the Commission should have granted Lakeshore additional costs to meet
bookkeeping and consulting requirements. In its ninth finding of fact, the Commission determined
that Lakeshore "needs to maintain more complete and detailed bookkeeping and should segregate
the bookkeeping for the Point LaVista and Esquire Estates II systems, which could require
additional bookkeeping." Lakeshore argued in its motion for rehearing before the Commission
and before the district court that while it had received the bookkeeping salary expenses requested
in its application, its request had not anticipated the additional expense that the utility would incur
in order to comply with the Commission's order.

 In order for a utility's expenses to be categorized as reasonable operating expenses,
the utility must prove that operating expenses have been actually incurred. Public Util. Comm'n
v. Houston Lighting & Power Co., 748 S.W.2d 439, 441 (Tex. 1987). Accordingly, the
Commission properly denied Lakeshore's request for additional costs to meet future bookkeeping
and consulting requirements. Lakeshore may seek recovery of these expenses, if they are indeed
incurred, in a future rate proceeding, but the Commission's denial of the future bookkeeping
expenses in this proceeding was not error. The Commission's fourth point of error is sustained.

 In its sixth point of error, the Commission argues that the district court erred in
finding that Lakeshore was entitled to attorney's fees in addition to those awarded by the
Commission. In its application, Lakeshore requested that $600 be included as operating expenses,
representing the costs of preparing the application. During Lakeshore's presentation of its rebuttal
evidence in the hearing, Lakeshore presented testimony that its attorney had dedicated forty hours
of labor, at $80 per hour, in preparing for the hearing; in effect, Lakeshore sought to orally
amend its request to ask for an additional $3,200 in attorney's fees. Then, in its written closing
statement, submitted one and one-half months after the evidentiary hearing had ended, Lakeshore
requested an additional $17,918 for legal fees and expenses incurred in the period following the
hearing. (13) Lakeshore increased the latter request to $19,408.61 in its response written closing
statement, supporting the request with an attached affidavit.

 The Commission allowed Lakeshore $600 for rate-case expenses. The Commission
disallowed any additional expenses on the basis that "[r]ate case expenses should bear a reasonable
relationship to the amount of rate increase allowed," and because "[n]o evidence was properly
introduced with respect to post-hearing rate case expenses incurred by Lakeshore." The district
court held that the Commission erred, finding that the Commission failed to include "[a]
reasonable amount for attorney's fees incurred by Lakeshore in pursuing its rate increase
application and this appeal and rehearing."

 The Water Code permits a utility to recover rate-case expenses by including them
as part of the utility's cost of service, provided the Commission does not find them to be
"unreasonable, unnecessary, or not in the public interest." Tex. Water Code Ann. § 13.185(h)(1)
(West 1988). Like other determinations on whether to allow expenses requested by a utility, the
Commission's ratemaking power includes the discretion to disallow improper legal expenses,
provided the Commission does not do so arbitrarily. See Public Util. Comm'n v. Houston
Lighting & Power Co., 748 S.W.2d at 441; Suburban Util. Corp. v. Public Util. Comm'n, 652
S.W.2d 358, 362-63 (Tex. 1983). Lakeshore requested the additional $3,200 in rate-case
expenses during its rebuttal segment of the hearing and requested the additional $17,918 six weeks
after the hearing was adjourned. Thus, the other parties to the Commission proceeding were
given no opportunity to present their own evidence to counter either of Lakeshore's added
requests. Given the fact that Lakeshore made its requests so late in the proceedings, we are
unable to conclude that the Commission improperly exercised its discretion in disallowing the
additional expenses. The Commission's sixth point of error is sustained.

 In its seventh point of error, the Commission argues that the district court erred in
reversing the Commission's order that directs Lakeshore to refund the excessive rates collected
during the pendency of the rate case. The Water Code provides that a utility must give a credit
to its customers equal to the difference between the rates charged during the pendency of the
administrative hearing and the rates established by the Commission's final order: "Unless
otherwise agreed to by the parties to the rate proceeding, the utility shall refund or credit against
future bills all sums collected during the pendency of the rate proceeding in excess of the rate
finally ordered plus interest as determined by the regulatory authority." Tex. Water Code Ann.
§ 13.187(c) (West Supp. 1994). Accordingly, because we are reversing the district court's
judgment and affirming the Commission's order, we sustain the Commission's seventh point of
error.



CONCLUSION


 For the foregoing reasons, we reverse the judgment of the district court and affirm
the order of the Texas Water Commission.



 

 Mack Kidd, Justice

Before Justices Powers, Kidd and B. A. Smith

Reversed and Rendered

Filed: May 18, 1994

Publish
1. [1]  Effective September 1, 1993, the Texas Water Commission was renamed the Texas
Natural Resource Conservation Commission. Act of July 30, 1991, 72d Leg., 3d C.S., ch. 3,
§ 1.085, 1991 Tex. Gen. Laws 4, 42.
2. [2]  The Commission granted Lakeshore a small increase in rates, but denied the balance of
Lakeshore's requests. We will discuss the Commission's order in greater detail while
addressing the Commission's points of error.
3. [3]  All citations in this opinion are to the current Administrative Procedure Act rather than
the former Administrative Procedure and Texas Register Act, because the recent codification
did not substantively change the law. Act of May 4, 1993, 73d Leg., R.S., ch. 268, § 47,
1993 Tex. Gen. Laws 583, 986; Administrative Procedure Act, Tex. Gov't Code Ann. §§
2001.001-.902 (West Supp. 1994) [hereinafter APA]. 
4. [4]  Lakeshore describes itself as a small utility struggling to properly request a rate increase
so that it may regain its financial viability, and yet hold the costs of seeking a rate increase to
a minimum. Lakeshore believes that its treatment by the Commission in this rate case was
arbitrary and capricious primarily because it feels that it is inappropriate to hold a small utility
like itself to the same standards of proof required of large utility companies. While the
statutes and rules presently make no such distinction, the current Natural Resource
Conservation Commission could consider promulgating rules to alleviate the financial burden
imposed on small utilities in bringing a rate case.
5. [5]  See Tex. Water Code Ann. § 13.002(2) (West Supp. 1994) (defining "affiliated
interest").
6. [6]  Traditionally, a utility's interest payments on long-term debt are used to compute the
utility's rate of return. Southern Union Gas Co. v. Railroad Comm'n, 692 S.W.2d 137, 141
(Tex. App.--Austin 1985, writ ref'd n.r.e.). However, nothing in the Water Code mandates
that interest payments not be treated as operating expenses, and section 13.185(e) seems to
permit such treatment, if found to be "reasonable and necessary."
7. [7]  The Commission computes a utility's allowable expenses by considering only expenses
incurred in a single test year chosen for the rate proceeding, adjusting for known and
measurable changes in the test year's expenses. 31 Tex. Admin. Code § 291.31(b) (1993). 
Review of the loan in this case essentially entails consideration of multiple test years, since the
loan proceeds were obtained over an eight-year period.
8. [8]  Also, the Commission's staff took the position that the interest expense necessarily
should not be passed on to Lakeshore's customers because it resulted solely from a
management decision to obtain a loan rather than a rate increase. Wayne M. Wiley, Jr., a
Commission accountant, testified at the hearing as follows:


 If the company chooses not to come in on an annual basis for a rate
increase but, instead, chooses to operate the company at what it calls an
operating loss, then it should not be, in my opinion, a problem that the utility
customers must be responsible for.


 What they are asking the utility customers to do is to be responsible for
decisions made by management. Management is the one that decided not to ask
for a rate increase, and if then that required that they put some extra money into
the system, then that was their decision--not the customers, and it certainly
wouldn't have to have interest on a hundred and fourteen thousand or whatever
the amount was to be their responsibility.

9. [9]  $385,000 was the value of the facilities that Lakeshore listed in its application as being
owned by its parent, Sentry, but used by Lakeshore to provide water and sewer services to
Lakeshore's customers.
10. [10]  This Court has recognized that "[m]uch of the utility industry consists of holding
company arrangements in which the utility operating company is the subsidiary of a parent
corporation." General Tel. Co. v. Public Util. Comm'n, 628 S.W.2d 832, 837 (Tex.
App.--Austin 1982, writ ref'd n.r.e.).
11. [11]  Though Lakeshore has not cited this portion of the record in its brief, the administrative
record does contain additional evidence of the facilities' value. During the hearing, Alan D.
Whatley, Lakeshore's manager, testified as follows when asked about the construction costs of
the facilities:


It would be an estimate. I can't give it to you accurately now, but I will be able
to. It's about $300,000 for the water and the sewer system, equally about
[$]150,000 for the water system and about that for the sewer collection and
treatment plant and the land that the treatment plant went on.


Mr. Whatley never did provide documentation of the construction costs of the facilities. This
"estimate" similarly lacks the specificity required by the Water Code for treatment as invested
capital. 
12. [12]  Water and sewer utility regulation was transferred from the Public Utility Commission
to the Texas Water Commission effective March 1, 1986. See Act of May 25, 1985, 69th
Leg., R.S., ch. 795, § 10.003(a), 1985 Tex. Gen. Laws 2719, 2820. 
13. [13]  The bulk of this request was to cover fees paid to a law firm that aided in the
preparation of the written closing statement in which the request appears. This firm neither
represented Lakeshore during its hearing before the Commission nor represents Lakeshore on
appeal.