TEXAS NATURAL RESOURCE CON-
SERVATION COMMISSION, Pe-
titioner,

v.

LAKESHORE UTILITY COMPANY,
INC., Sentry Title Company, Inc., Alan
D. Whatley, and Thelma J. Whatley,
Respondents.

No. 02–0988.

Supreme Court of Texas.

Argued Nov. 19, 2003.

Decided April 8, 2005.

Rehearing Denied June 24, 2005.

Philip Dale Mockford, Leonard H. Dougal, George Breck Harrison, Jackson & Walker, L.L.P., J. Stephen Dillawn, Atwood & Associates, Austin, J. Albert Kroemer, Prager Metzger & Kroemer, Dallas, for Petitioner.

Greg Abbott, Jane Elizabeth Atwood, Office of Atty. Gen., Howard G. Baldwin, First Asst. Atty. Gen., Jeffrey S. Boyd, Thompson & Knight, Karen Watson Kornell, Office of Atty. Gen., Barry Ross McBee, Office of Atty. Gen., and Linda B. Secord, Office of Atty. Gen., Natural Resource Div., Austin, for Respondent.

Justice O'NEILL delivered the opinion of the Court.

In this case arising from a Texas Natural Resource Conservation Commission[1]

---

1. We refer to the Public Utility Commission and the Texas Water Commission, both predecessors to the Texas Natural Resource Conservation Commission in the regulation of wastewater services, as "the Commission."

Effective September 1, 2002, the Texas Natural Resource Conservation Commission changed its name to the Texas Commission on Environmental Quality. 27 Tex. Reg. 8340 (2002); see Act of May 28, 2001, 77th Leg.,

enforcement action, we must decide whether the evidence is legally sufficient to support the trial court's determination that a utility company knowingly violated the Water Code by charging its customers unauthorized fees, and whether the Water Code authorizes the Attorney General, at the Commission's request, to seek customer refunds in district court to compel compliance with the Water Code's statutory provisions. Answering both questions in the affirmative, we affirm in part and reverse in part the court of appeals' judgment.

## I. Facts

Lakeshore Utility Company, Inc.,[2] is a water and sewer public utility providing service to customers in two residential subdivisions, Point La Vista and Esquire Estates II, adjacent to Cedar Creek Lake in Henderson County, Texas. Because Lakeshore's customers reside on property just above the lake, a typical gravity- or gradient-flow sewer system cannot be used in the subdivisions. Instead, a more complex and expensive "pressure-effluent system"[3] is used.

As a public utility, Lakeshore is subject to the jurisdiction of the Commission, which is charged with exercising regulatory authority over public utilities and fixing and regulating utility rates. *See* Tex. Water Code §§ 13.041(a) (providing that the Commission "may regulate and supervise

the business of every water and sewer utility"), 13.181(b) (authorizing the Commission to fix and regulate utility rates), 13.190(a) (mandating that utilities cannot "charge, demand, collect, or receive" a rate for service that is not authorized). Lakeshore's monthly utility rates and tap fees—the fees charged to install water and sewer utility services—must be listed on its approved tariff schedule, or schedule of rates, that is filed with the Commission. *Id.* § 13.136.

In 1977, the Commission accepted a tariff application from Lakeshore and approved monthly rates for both subdivisions as well as tap fees at a flat rate of $200 for water "Tap and Meter Installation" and $600 for sewer "Tap & Installation" at locations requiring "heavy-duty pump[ing] or excessive lift[ing]."

Between 1981 and 1989, Lakeshore submitted numerous tariff applications to the Commission requesting various changes to the Commission's 1977 approved rates and tap fees. Relevant to this case are the tariff applications Lakeshore made in 1981 and 1989 to increase the amounts approved by the Commission in its original 1977 tariff. These applications requested that the Commission approve monthly rate and tap-fee increases at each subdivision. In each instance, while awaiting the Commission's decision, Lakeshore charged its customers the increased amounts that it was requesting the Commission approve. In

---

R.S., ch. 965, § 18.01, 2001 Tex. Gen. Laws 1933, 1985.

**2.** The Commission's amended enforcement action also named as defendants Sentry Title Company, Inc., Lakeshore's parent company, which owns the physical plant and facilities Lakeshore uses, Alan Whatley, the president and a director of both Sentry and Lakeshore, and Thelma Whatley, who at relevant times was vice-president of both entities. For convenience, we refer to these parties collectively as "Lakeshore."

**3.** The pressure-effluent system requires that a holding tank, similar to a septic tank, be installed at each home together with one or two specialized cycling pumps to pump a home's wastewater from its holding tank into a utility's sewer mains for transport to a treatment plant. In this case, Lakeshore's pressure-effluent system pumps sewage uphill to Lakeshore's sewer mains at the roadway level.

response to each application, the Commission signed an order dismissing Lakeshore's request and directing Lakeshore to refund the increased fees collected from its customers while the application was pending. Because of the importance of the 1981 and 1989 tariff applications—particularly the resulting Commission orders that required Lakeshore to refund its customers—we detail the events surrounding each application below.

## A. The 1981 Tariff Application and Resulting 1983 Orders

In 1981, Lakeshore sought the Commission's authorization to increase its monthly utility rates and to increase its tap fees to $375 for water and $1,150 for sewer services. Lakeshore's request noted parenthetically that the new sewer rate would include "pump[s], tanks, valves, fittings, & controls." Lakeshore charged its customers the increased amounts pending the Commission's decision. In January 1983, the Commission issued an order denying the requested rate and fee increase and directing Lakeshore to charge tap fees no higher than "actual cost, not to exceed $200.00" for water and "actual cost, not to exceed $600.00" for sewer installation services. Accordingly, Lakeshore was not to charge amounts exceeding those formerly approved on its 1977 tariff. The Commission also ordered Lakeshore "to refund to its customers all monies collected in excess of the rates set forth [in its 1977 tariff]," and to provide the Commission with the name of each customer refunded and the amount within the next two months. Lakeshore was told its failure to comply would result in referral to the Attorney General's office for prosecution. As will be seen, however, Lakeshore continued to charge customers the disapproved amounts.

Just two months after the Commission's January 1983 Order denying Lakeshore's requested increase, Lakeshore was involved in a dispute concerning the Commission's certification of another public utility called the St. Paul Industrial Training School. As part of the certification process, the Commission undertook an examination and inquiry into Lakeshore's tap fee charges and issued an order in March 1983 called the St. Paul Order. In the St. Paul examiner's report, which was adopted by the Commission in its order, the examiner found that Lakeshore had been charging its customers sewer tap fees of $1,150 when the Commission had refused to approve this amount. The examiner noted that Lakeshore's overcharges constituted a violation of the statutory provision providing that "[n]o public utility may, directly or indirectly by any device whatsoever or in any manner; [sic] charge, demand, collect, or receive from any person" any amount other "than that prescribed in the schedule of rates of the public utility." *See* Tex. Water Code § 13.190(a). The examiner concluded that the Commission should monitor Lakeshore's tap fee charges and "request the Attorney General to bring an action in District Court, in the Commission's behalf" to require Lakeshore's compliance with the provision if the Commission's monitoring revealed that rates other than tariffed rates were charged. It is unclear, though, whether the Commission took any further action to ensure Lakeshore's compliance with either the Commission's January 1983 Order or the St. Paul Order.

## B. The 1989 Rate Application and Resulting Order

In January 1989, Lakeshore filed another request for authorization from the Commission to increase its monthly rates and to increase tap fees for both residential subdivisions to $375 for water and $1,350 for sewer services. While the request was pending, Lakeshore again charged its cus-

tomers the proposed fees. On December 21, 1989, the Commission denied Lakeshore's application and ordered Lakeshore to refund approximately $29,000 in overcharges collected during the pendency of Lakeshore's request by crediting customers' future bills. The refund was ordered pursuant to Texas Water Code section 13.187, which provides: "[A] utility shall refund or credit against future bills all sums collected during the pendency of [a] rate proceeding in excess of the rate finally ordered plus interest as determined by the regulatory authority." *Id.* § 13.187(c). The Commission additionally ordered Lakeshore to provide an accounting to the Commission of all tap fees that Lakeshore customers paid from December 8, 1981, through December 14, 1989. Because the Commission denied Lakeshore's requested increase, Lakeshore's approved tap fee amounts remained the same as those approved in 1977.

### C. The Lawsuit

Both Lakeshore and the Commission brought suit in district court concerning the 1989 Order. Believing the Commission's continued refusal to increase rates and tap fee amounts was unfair, Lakeshore sought judicial review of the Commission's decision denying its 1989 application. The Commission, concerned that Lakeshore was refusing to comply with the 1989 Order, sought to enforce the order under sections 13.411 and 13.414 of the Water Code. The Commission specifically alleged that Lakeshore was actively violating the 1989 Order by failing to refund customers for overcharges and by continuing to charge fees in excess of those approved by the Commission. The Commission sought civil penalties "for each day Lakeshore … has been in violation of the Water Code and the Commission's order since December 21, 1989," and to enjoin Lakeshore from future violations. The court consoli-

dated the cases and, in a single judgment, found in favor of Lakeshore, reversed the Commission's 1989 Order, and dismissed the Commission's enforcement action.

### D. First Appeal and Remand

The court of appeals reversed the district court's judgment and reinstated the Commission's 1989 order, which required Lakeshore to charge no more then $600 for sewer and $200 for water installation services, and to refund its customers approximately $29,000 in overcharges made during the pendency of Lakeshore's 1989 tariff application. The Commission's reinstated enforcement action was remanded to the district court for further proceedings. *Tex. Water Comm'n v. Lakeshore Util. Co.*, 877 S.W.2d 814 (Tex.App.-Austin 1994, writ denied).

On remand, the Commission amended its original pleadings in the district court to seek customer refunds for overcharges dating back to 1981, when Lakeshore began to charge its customers amounts the Commission had not approved. The Commission claims it amended the original pleadings because it had learned through discovery that Lakeshore had been overcharging its customers for water and sewer services for that period of time.

After a bench trial, the district court found that between 1981 and 2001 Lakeshore had knowingly violated the Texas Water Code by overcharging its customers and assessed civil penalties in the amount of $126,400, which related to tap fee overcharges that occurred both before and after the 1989 Commission proceedings. The court also ordered Lakeshore to refund $106,417.66 to its customers for equipment, tap fee, and monthly rate overcharges between 1981 and 2001, and to pay its customers $68,851.43 in interest on overcharged amounts, plus attorneys' fees and court costs.

## E. The Second Appeal

Lakeshore appealed only the parts of the trial court's judgment that ordered it to (1) pay civil penalties for "knowing" Water Code violations that occurred prior to the 1989 Order, and (2) refund unauthorized charges to customers beyond those Lakeshore was obligated to refund by the 1989 Order. The court of appeals affirmed the civil-penalties portion of the judgment, concluding there was legally sufficient evidence in the record to support the trial court's finding that Lakeshore knowingly violated the Water Code before the 1989 proceedings. 92 S.W.3d 556, 563. But the court of appeals reversed that part of the judgment requiring Lakeshore to refund customer overcharges that occurred before the 1989 proceedings, holding that, absent a Commission order directing a utility to refund or credit unauthorized charges, the Water Code does not authorize a district court action to recover those charges. *Id.* at 563–65.

Both the Commission and Lakeshore petitioned this Court to reverse portions of the court of appeals' judgment. Lakeshore contends the court of appeals erred in holding there was legally sufficient evidence that Lakeshore knowingly violated the Water Code before 1989. The Commission argues the court of appeals erred in reversing the trial court's refund order. We granted both petitions for review to consider the issues presented.

## II. Water Code Violations

We first consider whether there is legally sufficient evidence to support the trial court's finding that Lakeshore knowingly violated sections 13.135 and 13.190 of the Texas Water Code before 1989 by charging customers fees higher than those the Commission approved.[4] Section 13.135 provides that "[a] utility may not charge, collect, or receive any rate for utility service ... other than as provided in this chapter." Tex. Water Code § 13.135. Section 13.190 provides that "[a] water and sewer utility may not directly or indirectly ... charge, demand, collect, or receive from any person a greater or lesser compensation for any service rendered or to be rendered by the utility than that prescribed in the schedule of rates of the utility applicable to that service when filed in the manner provided in this chapter." *Id.* § 13.190. At the relevant time, section 13.414(a) of the Water Code provided that "any utility or affiliated interest that *knowingly* violates [chapter 13 of the Water Code] ... is subject to a civil penalty" of up to $5,000 a day. Act of May 26, 1985, 69th Leg., R.S., ch. 795, § 3.005, 1985 Tex. Gen. Laws 2789, 2802 (emphasis added).[5]

The Water Code does not define "knowingly," and we have never interpreted the term as it is used in section 13.414(a); however, " 'unless the text of a statute dictates a different result, the term

4. The relevant provisions were codified in 1985. *See* Act of May 26, 1985, 69th Leg., R.S., ch. 795, § 3.005, 1985 TEX. GEN. LAWS 2789, 2789–804. The statutory predecessors to these provisions were in effect when Lakeshore began overcharging its customers. Act of May 29, 1975, 64th Leg., R.S., ch. 721, §§ 31, 46, 1975 Tex. Gen. Laws 2327, 2339, 2344. However, the predecessor statutes do not materially differ, and we cite the current provisions throughout this opinion for convenience.

5. The act was amended in 1991 to remove "knowingly" from the provision and to reduce the amount of the penalty per violation. Act of May 27, 1991, 72d Leg., R.S., ch. 678, § 14, 1991 Tex. Gen. Laws 2463. Lakeshore only contests the civil penalty it was ordered to pay for customer overcharges that the trial court determined it made "knowingly" prior to the Commission's 1989 Order.

"knowingly" merely requires proof of knowledge of the facts,'" and not knowledge of the law. *United States v. Ho,* 311 F.3d 589, 605 (5th Cir.2002) (quoting *Bryan v. United States,* 524 U.S. 184, 193, 118 S.Ct. 1939, 141 L.Ed.2d 197 (1998)); *see also Osterberg v. Peca,* 12 S.W.3d 31, 38 (Tex.2000) (holding as a general proposition that ignorance of the law is not a defense to a statute's violation; the term "knowingly" in the Election Code refers only to a person's knowledge of the act of making or accepting a contribution, and not to whether the contribution violated the Election Code). Our Penal Code recognizes this principle in providing that "[a] person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist." Tex. Pen.Code § 6.03(b). Federal courts construing knowledge requirements in environmental regulatory statutes—which provide for criminal sanctions very similar to the Water Code's civil penalty provision—have concluded that the proof necessary to establish a "knowing violation" of a regulation is merely proof that the violator had knowledge of the facts comprising the violation. *E.g., Ho,* 311 F.3d at 606 (citations omitted). We see no reason to depart from this principle when interpreting the proof required to show a knowing violation under section 13.414(a) of the Water Code. If we held otherwise, enforcement of the Water Code would be problematic be-cause the focus would be on whether the person violating the code knew about the specific code provisions and was operating under a correct legal interpretation. *See Osterberg,* 12 S.W.3d 31 at 38. Thus, to prove a "knowing" Water Code violation, the Commission needed to establish only that Lakeshore knew the facts that comprised a violation of the Water Code's provisions—namely, that Lakeshore knew it was charging fees that were not approved on Lakeshore's tariff schedule by the Commission.

Lakeshore admits it routinely charged customers amounts that exceeded the tap fees filed with and approved by the Commission. But relying on *General Electric Co. v. United States Environmental Protection Agency,* 53 F.3d 1324, 1329 (D.C.Cir.1995), Lakeshore contends it did not *knowingly* violate the Water Code in charging these amounts because it was not given "fair notice" that the tanks, pumps, and equipment necessary to effectively transfer wastewater from each home within its pressure-effluent system were included within its designated "tap fee," nor did it know that the Water Code prohibited charging separately for these items. Specifically, Lakeshore claims it lacked "fair notice" because prior to 1987, the Commission's rules failed to define the term "tap fee" [6] and Lakeshore could not "knowingly" violate Commission rules that did not exist during the relevant time period. Lakeshore further argues that the

---

**6.** In 1987, the Commission, for the first time, defined "tap fee":

> Tap fee—A tap fee is the charge to new customers for initiation of service where no service previously existed. A tap fee may include the cost of physically tapping the main and installing meters, meter boxes, fittings and other materials, labor, setting up the new customer's account, and allowances for equipment and tools used. Extraordinary expenses such as road bores and street crossing may be added. Other charges, such as extension fees or contributions in aid of construction (CIAC) are not to be added in a tap fee.

12 Tex. Reg. 3121 (1987) (emerg. rule 31 TEX. ADMIN. CODE § 291.3) (adopted Sept. 2, 1987, expired Dec. 31, 1987). The definition of tap fee has been modified since its 1987 adoption, but these modifications are not relevant to our analysis. See 30 TEX. ADMIN. CODE § 291.3(45).

definition of "tap fee," once adopted, was unclear because it provided that a utility company could charge customers for "extraordinary expenses" in addition to their approved tap fee amounts, but the definition failed to explicitly define what "expenses" qualified as "extraordinary." As a result, Lakeshore argues it mistakenly believed that the pumps and equipment necessary to operate its pressure-effluent system qualified as "extraordinary expenses"; therefore, Lakeshore did not "knowingly" violate the Water Code in charging for these items in addition to its approved tap fee.

Lakeshore makes a similar argument about an emergency regulation the Commission adopted in 1986 that allowed utility companies to charge residential customers for "unique" and "non-standard" costs in addition to their approved tap fees under certain exceptional circumstances. 11 Tex. Reg. 1266 (1986) (emerg. rule 31 Tex. Admin. Code § 291.84 (adopted March 5, 1986, expired July 3, 1986)).[7] Lakeshore claims that, because the regulation did not define the terms "unique" and "non-standard," Lakeshore "reasonably believed" that the costs associated with its pressure-effluent system qualified as "unique" and "non-standard" and could therefore be charged to customers in addition to its approved tap fees.

■ We find Lakeshore's argument unpersuasive. Lakeshore admits knowing that it was charging rates and fees that the Commission had not approved, and as we have stated, its subjective interpreta-

tion of the Water Code's provisions is immaterial. *See Ho*, 311 F.3d at 606. To prove a knowing violation of the Water Code, the Commission needed to prove only that Lakeshore knew that it was charging more than its approved tariff. We hold that the evidence is legally sufficient to support the trial court's finding that Lakeshore knew it was charging unapproved amounts. To begin, since the inception of Lakeshore's pressure-effluent system in 1977, every Lakeshore customer within the system has been required to install the same or similar pumps and equipment. Lakeshore's approved 1977 tariff listed its "Tap and Meter Installation" fee at $200 for water and "Tap & Installation" fee at a "maximum" of $600 for sewer locations "requiring heavy-duty pump or excessive lift." Because Lakeshore's approved amounts were for "Tap & Installation" and "Tap and Meter Installation" and specifically included a maximum amount to be charged in areas requiring "heavy-duty pump[ing] or excessive lift[ing]," Lakeshore must have understood that the $200 and $600 amounts were meant to include all installation costs—including those for the specialized pumps and equipment necessary to operate its pressure-effluent system—within a single installation fee.

In 1981, Lakeshore sought to increase its water and sewer tap installation fees to $375 and $1,150, respectively. Lakeshore's rate application specifically stated that the $1,150 sewer installation amount was for "pump[s], tanks, valves, fittings, &

---

7. The regulation that Lakeshore refers to has been modified from its original version enacted in 1986. The current regulation provides that:

[c]ontributions in aid of construction shall not be required of individual residential service applicants for production, storage, treatment, or transmission facilities unless that residential customer places unique,

non-standard service demands upon the system, in which case, the customer may be charged the additional cost of extending service to and throughout his property . . . . 30 TEX. ADMIN. CODE § 291.86(c)(1). Because the current provision does not differ substantially from the 1986 version that Lakeshore relies upon, we cite the current provision for convenience.

controls." Lakeshore, therefore, must have understood its tap fee was meant to include each of these costs. In 1983, the Commission rejected Lakeshore's proposed increases, ordered Lakeshore to charge a maximum of $200 for water and $600 for sewer installation services, and ordered Lakeshore to refund customers any charges it had received for unapproved amounts. Because the Commission specifically ordered Lakeshore to refund *any* unauthorized charges above approved amounts, specified the maximum amounts that could be charged, and rejected any additional charges for "pump[s], tanks, valves, fittings, & controls," Lakeshore must have known the Commission disapproved of any charges above those explicitly stated and was prohibited from charging separately for the "pump[s], tanks, valves, fittings, & controls" necessary to operate its pressure-effluent system. Nevertheless, the record reflects that Lakeshore continued to overcharge customers exactly the prohibited amounts at least through 1989, despite a specific warning from the examiner in the St. Paul Order that "charging a tap fee of $1,150, despite the fact that a fee of that magnitude ha[d] not been approved by the Commission[,] ... constitutes a violation of [the Water Code's provisions]."

We agree with the court of appeals that there is legally sufficient evidence in the record to support the trial court's finding that Lakeshore knew it was charging fees that were not approved on Lakeshore's tariff schedule by the Commission. 92 S.W.3d at 563. Accordingly, legally sufficient evidence supports the trial court's conclusion that Lakeshore knowingly violated the Water Code.

## III. Customer Refunds

We next consider the scope of relief the Attorney General may seek in an enforcement action brought at the Commission's request under section 13.411(a) of the Water Code. Section 13.411(a) defines the nature of that relief as follows:

> If the commission has reason to believe that any retail public utility or any other person or corporation is engaged in or is about to engage in any act in violation of this chapter or of any order or rule of the commission entered or adopted under this chapter or that any retail public utility or any other person or corporation is failing to comply with this chapter or with any rule or order, the attorney general on request of the commission, in addition to any other remedies provided in this chapter, shall bring an action in a court of competent jurisdiction in the name of and on behalf of the commission against the retail public utility or other person or corporation to enjoin the commencement or continuation of any act or *to require compliance with this chapter or the rule or order.*

Tex. Water Code § 13.411(a) (emphasis added). The parties agree, and the court of appeals recognized, that the plain statutory language authorizes both (1) requests to enjoin present or future violations, and (2) requests to *compel compliance with the Water Code,* an agency rule, or an order. It is the scope of the latter power—to compel compliance with the Water Code—that lies at the heart of the parties' dispute.

The court of appeals held that, although refunds were recoverable under section 13.411(a), before requesting refunds in district court the Commission had to first issue its own administrative order compelling refunds. Specifically, the court of appeals held that "[a]t most the code gives the Commission, through the attorney general, the authority to seek a district court

judgment enforcing a Commission order commanding refunds." 92 S.W.3d at 565.

The Commission contends the court of appeals' holding was erroneous. First, the Commission argues that it did issue its own administrative order compelling refunds in 1983 and 1989, and that the district court could, and did, enforce these orders by its judgment. Those orders required Lakeshore to refund customer overcharges made during the pendency of Lakeshore's rate applications and either explicitly or implicitly forbade Lakeshore from charging amounts exceeding those that the Commission had approved. Accordingly, the Commission claims, the 1983 and 1989 Orders are sufficiently broad to support the district court's judgment ordering refunds from 1981 to 2001. Lakeshore, on the other hand, argues that the 1983 and 1989 Orders were not broad enough to encompass overcharges from 1981 to 2001 because the orders only required Lakeshore to refund the unapproved amounts Lakeshore had charged during the pendency of its rate applications.

The Commission next contends that, even if the 1983 and 1989 Orders were not sufficiently broad to cover customer refunds for the twenty-year time period in issue, the court of appeals was wrong in making the district court's power to "require compliance with [the Water Code]" entirely dependent on a prior agency refund order. *See* Tex. Water Code § 13.411(a). The Commission acknowledges that an agency order may be a necessary prerequisite to establishing subject-matter jurisdiction in the district court when a case is filed by a *utility* challenging an agency action. The Commission contends, however, that a prior agency order is not necessary for the *Commission* to bring an original enforcement proceeding in district court to "require compli-

ance" with the Water Code under section 13.411(a). *Id.* According to the Commission, "this is the first time that a district court's original jurisdiction in an enforcement case has been made dependent on an agency order." Lakeshore responds that the Commission lacks statutory authority under section 13.411(a) to pursue a refund action in district court absent a prior Commission order specifically directing such refunds, in essence arguing that the district court's enforcement power is derivative of the Commission's.

We conclude that, whether or not the 1983 or 1989 Orders were sufficiently broad to cover refunds for the entire twenty-year time period in dispute, the Commission has statutory authority to pursue an enforcement action in district court to "require [a utility's] compliance with [the Water Code]," and that authority includes the ability to seek refunds when a utility charges fees that the Water Code prohibits. *See id.*

 We begin with the well-established principle that, as an administrative agency, the Commission may exercise only those powers that the Legislature confers upon it in clear and express language, and cannot erect and exercise what really amounts to a new or additional power for the purpose of administrative expediency. *Pub. Util. Comm'n v. City Pub. Serv. Bd. of San Antonio,* 53 S.W.3d 310, 316 (Tex. 2001); *see Pub. Util. Comm'n v. GTE–Southwest, Inc.,* 901 S.W.2d 401, 407 (Tex. 1995). This is because, as an administrative agency, the Commission is a creature of the Legislature with no inherent authority of its own. *See City Pub. Serv. Bd. of San Antonio,* 53 S.W.3d at 316; *GTE–Southwest,* 901 S.W.2d at 406; *see also State v. Pub. Util. Comm'n,* 883 S.W.2d 190, 194 (Tex.1994). In deciding whether an agency has acted within its powers, a court should also determine whether an

agency's power is implied in the statute. When the Legislature expressly confers a power on an agency, it also impliedly intends that the agency have whatever powers are reasonably necessary to fulfill its express functions or duties. *City Pub. Serv. Bd. of San Antonio,* 53 S.W.3d at 316; *GTE–Southwest,* 901 S.W.2d at 407; *Tex. Workers' Comp. Comm'n v. Patient Advocates,* 136 S.W.3d 643, 652 (Tex.2004).

■■ One of the Legislature's express purposes in enacting the Water Code was to ensure rates, operations, and services that are just and reasonable to consumers:

The purpose of this chapter is to establish a comprehensive regulatory system that is adequate to the task of regulating retail public utilities to assure rates, operations, and services that are just and reasonable to the consumers and retail public utilities.

Tex. Water Code § 13.001(c). To this end, the Legislature vested the Commission with the power and authority to "regulate and supervise the business of every water and sewer utility," and to "fix and regulate rates of utilities." *Id.* §§ 13.041(a), 13.181(b). Utilities under the Code cannot charge, collect, or receive a rate for services not authorized by the Commission. *Id.* §§ 13.135, 13.190. If a utility charges more than its authorized rates, the Legislature has provided the Commission with a mechanism for enforcement; by its clear and express language, section 13.411(a) authorizes the Commission to request that the Attorney General bring an action in court "to *require compliance* with [the Water Code]." *Id.* § 13.411(a) (emphasis added). The Legislature neither specified nor limited the types of relief the Attorney General might seek in district court to effect a utility's compliance with the Water Code. For instance, the Legislature did not say that any such relief must be prospective only or that it must be confined to the

imposition of civil penalties. Nor did the Legislature say that the Commission had to first issue its own order before it could seek to compel compliance through the district court. The Legislature simply stated that the Attorney General, at the Commission's request, may bring suit "to require compliance" with the Water Code. *See id.* We must therefore determine whether the relief that the Commission sought here—a refund of customer overcharges—is a remedy consistent with its power to compel Lakeshore's compliance with the Water Code through the district court. We hold that it is.

■ Our primary objective in construing the proper scope of an enforcement action under section 13.411(a) is to ascertain and give effect to the Legislature's intent by first looking at the statute's plain and common meaning. *Tex. Workers' Comp. Comm'n,* 136 S.W.3d at 652; *see also* Tex. Gov't Code § 312.005. We determine legislative intent by reading the statute as a whole and interpreting the legislation to give effect to the entire act and not just its isolated portions. *City of San Antonio v. City of Boerne,* 111 S.W.3d 22, 25 (Tex.2003).

As we have said, the Legislature's intent in conferring enforcement power through the district court was, at least in part, to ensure that consumers would not be charged unapproved rates. *See* Tex. Water Code § 13.001(a). When a utility has violated the Water Code by overcharging its customers, refunds may be necessary to effect compliance with Water Code provisions mandating that customers be charged only approved amounts. *See id.* §§ 13.135, 13.190. In this case, for instance, the total amount Lakeshore collected from its customers far exceeded the amount Lakeshore was authorized to collect under the Code's provisions; thus, refunds were necessary to bring Lake-

shore into statutory compliance and ensure that it did not retain the benefit of unlawful overcharges. In seeking refunds, then, the Commission is not crafting a new or additional power; on the contrary, it is exercising its explicit power to require a utility's compliance with Water Code provisions and thereby vindicate the regulatory process. In seeking the refund, the Commission might have chosen to pursue an agency-level enforcement proceeding before requesting the Attorney General to bring a judicial action, but nothing in section 13.411(a) says that an administrative order is a prerequisite to a judicial one in an action brought to "require [a utility's] compliance with [the Water Code]." *Id.* § 13.411(a).

In sum, we agree with the Commission that the customer refunds it sought were within its express statutory enforcement powers. Accordingly, we reverse that portion of the court of appeals' judgment restricting refunds to only those amounts specifically provided for in the Commission's January 21, 1983 and December 21, 1989 orders.

## IV. Conclusion

We affirm that portion of the court of appeals' judgment that imposes civil penalties based on Lakeshore's knowing violations of the Water Code. We reverse that portion of the court of appeals' judgment disallowing customer refunds and otherwise affirm the court of appeals' judgment.